[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| KATANA SILICON TECHNOLOGIES LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GLOBALFOUNDRIES, INC.;<br>GLOBALFOUNDRIES U.S. INC.; and<br>GLOBALFOUNDRIES U.S. 2 LLC<br><br>Defendants. | Case No. AU:22-CV-00852-RP<br><br>JURY TRIAL DEMANDED |

**DEFENDANTS' OPPOSED MOTION TO EXCLUDE CERTAIN OPINIONS OF MR. STEPHEN DELL REGARDING DAMAGES**

[redacted]

[redacted]

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................... 1
II. BACKGROUND .................................... 2
A. Plaintiff Katana, Acquisition of the Asserted Patents, and Katana's Licenses .................................... 2
B. Evolution of Planar Transistors and Release of 3D FinFETs .................................... 3
C. GlobalFoundries and the Accused Components .................................... 4
D. Mr. Dell's Expert Report and Damages Model .................................... 4
III. LEGAL STANDARDS .................................... 5
IV. ARGUMENT .................................... 6
A. The Numerical Agreement .................................... 7
B. IBM Licensing Policy .................................... 10
C. [redacted] Valuation and Arbitration Expert License Rates .................................... 11
D. Katana's Offered Rates .................................... 14
E. Weighted Average Cost of Capital ("WACC") .................................... 15
F. Mr. Dell Failed to Reliably Apportion to the Value of the Patented Inventions .................................... 16
V. CONCLUSION .................................... 20

[redacted]

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020)....................18

*Commonwealth Scientific and Industrial Research Organisation v. Cisco Systems, Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)....................18, 19

*Elbit Systems Land and C4I Ltd. v. Hughes Network Sys., LLC*,
927 F.3d 1292 (Fed. Cir. 2019)....................18

*Ericcson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)....................6, 16

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)....................7

*Integra Lifesciences I, LTD. v. Merck KGaA*,
331 F.3d 860 (Fed. Cir. 2003)....................12

*LaserDynamics, Inc. v. Quanta Comp., Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................7

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)....................6, 11

*MLC Intellectual Prop., LLC v. Micron Tech.*,
10 F.4th 1358 (Fed. Cir. 2021) ....................17

*Mondis Tech. Ltd. v. LG Elecs., Inc.*,
2021 WL 4077563 (D.N.J. Sept. 8, 2021) ....................18

*NNCrystal US Corp. v. Nanosys, Inc.*,
2023 WL 2891453 (D. Del. Apr. 11, 2023)....................19

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed Cir. 2021) ....................17, 19

*ResQnet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010)....................7, 10

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015)....................6

[redacted]

*TV Interactive Data Corp. v. Sony Corp.*,
929 F. Supp. 2d 1006 (N.D. Cal. 2013) ....................12, 13

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)....................10

*Utah Med. Prods., Inc. v. Graphic Controls Corp.*,
350 F.3d 1376 (Fed. Cir. 2003)....................11

*Vectura Ltd. v. GlaxoSmithKline LLC*,
981 F.3d 1030 (Fed. Cir. 2020)....................17

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)....................6, 10

*VLSI Tech. LLC v. Intel Corp.*,
87 F.4th 1332 (Fed. Cir. 2023) ....................16

*Whitserve v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012)....................14

**Statutes**

35 U.S.C. § 284....................6

**Other Authorities**

Fed. R. Evid. 702 ....................5, 6

# TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| A | Expert Report of Stephen E. Dell, CVA Relating to Damages (December 20, 2023) |
| B | Deposition Transcript of Stephen E. Dell, CVA Excerpts (December 5, 2024) |
| C | Expert Report of Dr. Kelin Kuhn Regarding Infringement of U.S. Patent No. 6,291,861 Excerpts (December 20, 2023) |
| D | Deposition Transcript of Kelin Jo Kuhn, Ph.D. Excerpts (December 10, 2024) |
| E | Expert Report of Stephen L. Becker, Ph.D. Excerpts (February 23, 2024) |
| F | Expert Report of John C. Bravman on the Non-Infringement of U.S. Patent Nos. 6,291,861 and 7,402,903 Excerpts (February 23, 2024) |
| G | TransactionsIP Patent Valuation Witness Written Report Excerpts (KATANA004327) |
| H | December 2003 IBM Webpage (Ex. 26 to Deposition of Stephen Dell) |
| I | June 2004, August 2005, and February 2006 IBM Webpage (Exs. 27 to 29 to Deposition of Stephen Dell) |
| J | [redacted] (GF_KAT_00003113) |
| K | JAMS Arbitration Expert Report of Eric T. Carnick Excerpts (KATANA003277) |
| L | Longhorn IP Business Presentation Excerpts (KATANA001602) |
| M | Longhorn IP Business Presentation Excerpts (KATANA001666) |
| N | Longhorn IP Business Presentation Excerpts (KATANA004047) |
| O | Numerical Technologies, Inc. Production License (KATANA007074) (Ex. 18 to the Deposition of Stephen Dell) |
| P | Bloomberg Article Titled “IBM Loses Top Patent Spot After Decades as IP Leader” Excerpt |

[redacted]

## I. INTRODUCTION

The Court should exercise its gatekeeping role to prevent plaintiff Katana Silicon Technologies LLC ("Plaintiff" or "Katana")'s damages expert Stephen Dell from presenting hyper-inflated damages figures for the two patents asserted in this case—[redacted] million for U.S. Patent 6,291,861 ("the '861 Patent") and [redacted] million for U.S. Patent 7,402,903 ("the '903 Patent")—based on data points lacking any relation to this case.

Actual market evidence shows that Katana purchased the '861 Patent in 2018 as part of a group of patents for [redacted]. Katana then licensed it with many other patents to other semiconductor companies for between [redacted] to [redacted] million—based on cash consideration and the value placed by Katana on patents assigned to it in those transactions. Rather than recognize the market evidence showing a low value for the '861 Patent as of the 2015 hypothetical negotiation, Mr. Dell opines that GlobalFoundries would have agreed to pay more than [redacted] x the [redacted] sale price of an entire portfolio, and multiples of what others paid to license it and numerous patents.

To do so, Mr. Dell relies on a 2000 agreement between a software provider and another semiconductor company, while never accounting for the valuable software bundled as part of that agreement. Mr Dell also ignores the 15-year gap between that software agreement and the hypothetical negotiation, including significant changes in semiconductors during that time. He then relies on an IBM licensing "policy" that is so broad that it could apply to nearly every patent case in the tech industry, with no analysis showing economic and technological comparability to the hypothetical negotiation. He also relies on two sets of license rates for entire portfolios where, again, no expert in this case has opined they are comparable. Finally, Mr. Dell relies on Katana's own offered licensing rates, which consummated agreements show were soundly rejected. None of these data points are tied to the facts of this case—a hypothetical negotiation in 2015 for a specific asserted patent—and only allow Mr. Dell to inflate damages.

[redacted]

Katana acquired the '903 Patent as part of one of its license transactions; and when Katana had to pay its former counsel based on the value of the '903 Patent, Katana said it was worth [redacted]. But in this case, Mr. Dell discounts that figure and opines that GlobalFoundries would have agreed to pay over [redacted] million for a non-exclusive license. He relies on many of the same unreliable data points above and adds a new variable: a GlobalFoundries' financial metric that is an average across its entire business and is untied to anything related to this case.

Finally, even if any of these data points were sufficiently tied to the facts of the case, Mr. Dell's analysis is fundamentally flawed for failing to apportion his royalty to the value of just the patented inventions, which cover minor aspects of the accused semiconductor wafers made by thousands of processing steps. Instead of performing this analysis, Mr. Dell alleges that there is "built-in apportionment" of comparable data points. Notwithstanding that Mr. Dell failed to establish comparability, it is well-established that comparability alone is insufficient for built-in apportionment, and he failed to do the additional analysis required to show built-in apportionment.

Because the basis of his damages figures and opinions should be excluded, his conclusions and calculations should be excluded. GlobalFoundries Inc., GlobalFoundries U.S. Inc., and GlobalFoundries U.S. 2 LLC, therefore, respectfully move to exclude certain portions of the Expert Report of Stephen E. Dell, CVA Relating to Damages (Ex. A).

## II. BACKGROUND

### A. Plaintiff Katana, Acquisition of the Asserted Patents, and Katana's Licenses

Katana is a patent assertion entity that acquires, licenses, and asserts patents. Ex. A ¶ 41. Katana acquired the '861 Patent as part of a group of patents purchased from [redacted] in 2018, for [redacted]. *Id.* ¶ 43. The '861 Patent issued in 2001 and expired in 2019. *Id.* ¶ 33. Katana subsequently engaged in a licensing campaign against various semiconductor companies—including [redacted] (*id.* ¶¶ 131–136, 45–48, 41); [redacted]

[redacted]

[redacted] ([redacted]) (*id.* ¶¶ 124–130); [redacted] ([redacted]) (*Id.* ¶¶ 143–148); and [redacted] (*id.* ¶¶ 137–142)—and entered licensing agreements with each.

In a 2019 agreement with [redacted], Katana accepted cash compensation of [redacted] million to grant a license for numerous patents, including the '861 Patent. *Id.* ¶ 133, 135. [redacted] agreed to assign several patents to Katana, including the other patent asserted here—the '903 Patent. *Id.* ¶ 135. The '903 Patent issued in 2008 and expired in 2024. *Id.* ¶ 37. Katana's agreements with [redacted] and [redacted] similarly involved cash compensation and the assignment of patents from [redacted] and [redacted] to Katana. Specifically, Katana accepted cash compensation of $[redacted] million from [redacted] for a license to numerous patents, including the '861 Patent, as well as the assignment of several [redacted] patents. *Id.* ¶¶ 127–128. And Katana accepted $[redacted] million from [redacted] for a license to numerous patents, including the '861 Patent, as well as the assignment of several [redacted] patents. *Id.* ¶¶ 139–141.

After its licensing campaign, Katana became involved in a dispute with its counsel over the latter's compensation. *Id.* ¶ 258. Katana owed its counsel compensation counsel based on the "gross consideration" received by Katana—including the value of the patents assigned to Katana. *Id.* To show that value, Katana relied on an expert opinion that determined the market value of each patent (*id.* ¶¶ 261). The value was: $[redacted] for the [redacted] patents (Ex. G at KATANA004348); $[redacted] for the [redacted] patents (*id.*); and $[redacted] for the [redacted] patents (*id.* at KATANA004350)—including [redacted] for the '903 Patent (*id.* at KATANA004349).

### B. Evolution of Planar Transistors and Release of 3D FinFETs

Semiconductor wafers are comprised of many individual chips which each contain many individual transistors. *Id.* ¶¶ 63, 72. These wafers are created via numerous steps and processes. *See, e.g.*, *id.* ¶¶ 70–72. Until the 2010s, the transistors created on these wafers used "a 'planar'

[redacted]

design, where the transistor was essentially built on a single plane." *Id.* ¶ 65. As manufacturers increased the density of transistors and dimensions shrunk, "a number of issues arose." *Id.* To address these limitations, the industry developed "a new technology advancement of using three dimensional gates, called fins, rather than a single plane." *Id.* ¶ 66. In the 2010s, the industry started manufacturing this new 3D transistor structure—called FinFETs. *Id.* ¶ 66–68; Ex. C ¶ 61.

### C. GlobalFoundries and the Accused Components

GlobalFoundries is a U.S.-based foundry which manufactures semiconductor wafers for its semiconductor design customers, based on their circuit designs, using highly specialized wafer manufacturing processes. Ex. A ¶¶ 55–56, 73. Two minor aspects of GlobalFoundries' technologies are accused. For the '861 Patent, the accused structure is an aspect of the FinFET transistor structure included in GlobalFoundries' 14 nm node LPP FinFET, 12 nm node LP FinFET, and 12 nm node LP+ FinFET. Ex. A ¶¶ 60, 89. The fin structure in FinFET is not accused; Katana recognizes that others in the industry invented and developed that technology. Ex. D at 221:5–6, 191:8-19. For the '903 Patent, the accused products are limited to those that use a so-called "through plug" (or through-silicon-via) to connect individual chips. Ex. A ¶¶ 38, 60.

### D. Mr. Dell's Expert Report and Damages Model

Mr. Dell opines that GlobalFoundries owes Katana at least $[redacted] million for the '861 Patent and $[redacted] million for the '903 Patent. Ex. A ¶ 32. Mr. Dell calculates these amounts based on his opinion that the parties at the 2015 hypothetical negotiations would have agreed to a royalty rate of 1.25% of revenue for use of the '861 Patent (*Id.* ¶¶ 342, 344, 114) and 1.0% and 3.5%[1] for use of the '903 Patent depending on the particular product (*Id.* ¶¶ 320, 324–325, 115).

---

[1] Applying this rate to Mr. Dell's [redacted] unit price (Ex. A at Attachment 9A) results in a $[redacted] royalty, which is [redacted] for including the feature (Ex. E ¶ 454).

[redacted]

For the '861 Patent, he bases his royalty rate primarily on (1) a single agreement from 2000 involving software technology provider Numerical Technologies, Inc. ("Numerical"), which included license rates between 0.5% and 2.5% and a mean weighted average of 1.25% (*Id.* ¶¶ 333–335, 338, 257); and (2) Katana's offered royalty rates during licensing negotiations (*id.* ¶ 332). Mr. Dell also relies on several other unreliable data points purporting to show similar royalty rates: (i) IBM's licensing "policy" (*id.* ¶¶ 275–276); (ii) rates identified as part of an evaluation of IBM's patent portfolio—[redacted] when GlobalFoundries acquired a portion of IBM's business, for which no expert has analyzed comparability to the hypothetical negotiation (*id.* ¶¶ 270–274); and (iii) rates identified by another expert for non-asserted patents in an arbitration between Katana and its former counsel, where again no expert has analyzed comparability to the hypothetical negotiation (*id.* ¶¶ 258–269).

For the '903 Patent, Mr. Dell bases his royalty on purported industry rates, Katana's desired royalty rate, and GlobalFoundries' weighted average cost of capital. *Id.* ¶¶ 316–329.

## III. LEGAL STANDARDS

To be admissible, the proponent of expert testimony must show the following: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Questions of the sufficiency of an expert's basis and the application of the expert's methodology are not questions of weight, but "critical questions" of admissibility. Fed. R. Evid. 702 Advisory Committee's Note to 2023 Amendment. "Judicial gatekeeping is essential" because jurors may "lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id.* at Note 2.

[redacted]

If infringement is found, Katana is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of **the invention**." 35 U.S.C. § 284 (emphasis added). To determine a reasonable royalty, patentees often present expert testimony regarding the results of a hypothetical negotiation, which seeks to determine what a willing licensor and willing licensee would have agreed to "had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324–25 (Fed. Cir. 2009). To be admissible, a patentee must show that its expert employed a reliable methodology and relied on data "sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (citation omitted). Opinions relying on data "not sufficiently tied to the facts of the case" are unreliable and should be excluded. *Id.*

And in analyzing damages, the patentee's expert must give "evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quotations omitted). The patentee must "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features using reliable and tangible evidence." *Ericcson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (quotations omitted). "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.*

## IV. ARGUMENT

Mr. Dell's opinions should be excluded under Rule 702 because his opinions rely on data "not sufficiently tied to the facts of the case." *Summit 6*, 802 F.3d at 1296. None of the bases for Mr. Dell's opinions have been—or can be—connected to the specific asserted patents in this case, the technologies in this case, or the parties in this case. Mr. Dell relies on but fails to establish

[redacted]

comparability of a software agreement executed 15 years prior to the hypothetical negotiation, for which he performed no analysis accounting for that time disparity or other major differences between that agreement and the bare patent license of the 2015 hypothetical negotiation. Mr. Dell also relies on a general IBM licensing policy that would apply to nearly every patent case; license rates for patent portfolios for which no expert has analyzed comparability to the hypothetical negotiation; and Katana's own desired but rejected licensing rates. In each case, Mr. Dell fails to demonstrate that they are comparable to the hypothetical negotiation to reliably inform the reasonable royalty in this case. For the '903 Patent, Mr. Dell adds an additional untethered data point: GlobalFoundries' weighted average cost of capital ("WACC") across its entire business. And even if any of these data points were tied to the case, none apportion to the value of the patented inventions as the law requires.

### A. The Numerical Agreement

Mr. Dell's reliance on a 2000 agreement between Numerical and UMC ("Numerical Agreement") should be excluded because Mr. Dell has failed to undertake a proper comparability analysis. "When relying on licenses to prove a reasonably royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). District courts must "exercise vigilance" in allowing an expert to perform a reasonable royalty calculation based on "past licenses to technologies other than the patent in suit." *ResQnet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). And an expert doing so "must account for differences in the technologies and economic circumstances of the contracting parties." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010). Those differences include the time gap between the hypothetical license and the date of the purportedly comparable license. *LaserDynamics*, 694 F.3d at 78 (noting that agreement 3 years from the hypothetical negotiation is not relevant in many ways due to

[redacted]

changing technological and financial landscape) (citation omitted). Here, the Numerical Agreement is a software agreement—not a bare patent license—and was executed in December 2000—approximately 15 years prior to the hypothetical negotiations. Ex. A ¶¶ 244; Ex. O.

Mr. Dell ignores that 15-year gap. Mr. Dell acknowledges "timing differences between the agreements[sic] and the hypothetical negotiations," (*id.* ¶ 334), but performs no analysis. While failure to analyze the significant time differences alone warrants exclusion, analysis of the record and Katana's own expert opinions reflect the many advances in semiconductors and their manufacture between 2000 and 2015. As Mr. Dell admits, the semiconductor industry is constantly advancing. Moore's law describes exponential growth in compute capability based on transistor density doubling every two years. *Id.* ¶¶ 63–64. Chips originally used planar transistors, and according to Katana's own technical expert Dr. Kuhn planar devices "evolved from very simple devices . . . to much more complex devices." Ex. C ¶ 57. She explained that the industry thought planar transistors could not shrink further after 2000, but then two "whole new environments" emerged after 2000: high-K metal gates in 2007 and process stress to allow further dimensional shrinking. Ex. D at 79:23–80:9, 77:13–14, 79:3–4, 117:10-118:22. There were many additional changes after 2000 just for planar technology. *See, e.g.*, *id.* at 36:11–12, 48:10–49:12.

The technology that underlies the accused products—FinFETs—was not even on the market in 2000. Intel first introduced it commercially in 2011. Ex. A ¶¶ 66–67. Indeed, Mr. Dell cites an article that describes this as "a fundamental departure" from the planar transistors that had thus far "powered all consumer electronic devices to date." *Id.* ¶ 67. Dr. Kuhn confirmed that the introduction of FinFETs "was a large change" that presented new challenges. Ex. D at 84:13, 84:25–85:25; Ex. C ¶ 61. According to Dr. Kuhn, the "more complex geometry of the fin also created design and process challenges not present in the planar design." Ex. C ¶ 64. FinFETs

[redacted]

were "outside of the typical Moore's Law scaling pattern" and a significant innovation. Ex. D at 86:1–10, 87:14–88:5.

But Mr. Dell ignored these numerous innovations between semiconductor technology that existed at the time of the 2000 Numerical Agreement (including planar-based transistors) and semiconductor technology that was subject to the 2015 hypothetical negotiation (including FinFET-based transistors). The fundamental changes in semiconductor device structure and significant evolution in technology between 2000 and 2015 should have been accounted for in Mr. Dell's reasonable royalty analysis.

In addition to ignoring the significant time gap and corresponding changes in technology, Mr. Dell also ignores other major differences associated with the Numerical Agreement. The Numerical Agreement was entered into by parties different from any of the parties at the hypothetical negotiation or in this case. Ex. A ¶ 244. And, the Numerical Agreement is not a ***bare patent license*** as in the hypothetical negotiation and has many elements beyond a patent license. Ex. O. Instead, it is titled a "Production License" and primarily involves delivery of ***software*** with associated license rights. *Id.* at KATANA007074. There is no evidence showing that any bare patent license was offered or taken separately from the software license. And Mr. Dell does not reconcile the fact that the driving force for the agreement was the software deliverable that UMC could use. Mr. Dell also fails to distinguish the value of the different elements of the agreement and isolate the value (if any) associated with the patent license element. And the record shows that the Numerical technology was far more impactful than the asserted '861 Patent. Ex. E ¶¶ 409–437. Numerous industry participants promptly adopted this software—showing its recognized importance by the industry—and touted the importance of the technology. *Id.* ¶¶ 410–416. In contrast, Mr. Dell offers no similar evidence showing the importance of the '861 Patent

via prompt licensing and industry praise. Mr. Dell fails to account for these many differences in his analysis. GlobalFoundries, therefore, respectfully requests that the Court exclude: Ex. A ¶¶ 244, 247–257, 277, 279–283, 293–297, 304, 306, 308, 333, 335, n.423.

**B. IBM Licensing Policy**

Mr. Dell's reliance on IBM's generic early 2000s purported licensing "policy" should be excluded because (i) it is not tied to the facts of the case and is (ii) akin to an improper "rule of thumb" that could be applied to almost any case. Mr. Dell relies on this "policy" wherein IBM licensed the tens of thousands of patents in its portfolio at a rate of 1% of the selling price of the product per patent, up to a maximum royalty rate of 5% regardless of the number of patents licensed in excess of 5. Ex. A ¶ 275. As an initial matter, the cited support for the existence of such a policy is an IBM webpage from 2003. Ex. A at Page 87 n.439. The 2003 webpage includes the policy. Ex. H. However, that same webpage from 2004-2006 shows it was removed (Ex. I)—casting doubt on whether it existed as of the 2015 hypothetical negotiations.

Next, there is no evidence of any actual consummated license agreements consistent with the license rates in this purported policy, and no evidence that IBM actually sought these rates or used its structure in actual negotiations—including at the time of the 2015 hypothetical negotiation. Based on the record evidence, this "policy" qualifies—at most—as an aspirational offer to license. Without any opinion on the technical and economic comparability of ***any actual license agreement*** observing the purported IBM policy to the hypothetical license, Mr. Dell's opinion relying on the IBM policy should be excluded. *See ResQNet.com,* 594 F.3d at 873.

Finally, the broad, generic nature of the IBM "policy" renders it an inadmissible, unreliable rule of thumb. Rules of thumb untethered to the facts of a case that do not differentiate between industries, technologies, or parties are inadmissible. *See VirnetX*, 767 F.3d at 1332 (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011)). Mr. Dell confirmed that this

[redacted]

IBM policy applies to all of IBM's patents for all of IBM's product categories, including all software, server, display, networking, e-business computing, storage, and microelectronics patents, and does not differentiate between industries or technologies. Ex. B at 225:21–228:5. Under Mr. Dell's theory, this IBM policy could support a 1% royalty for almost any patent—regardless of the technology, breadth of the patent, importance of the patent, industry, parties, etc. This is an impermissible rule of thumb that is untethered to the facts of any case. Indeed, this is worse than an isolated rule of thumb—this is a rule of thumb laundered through the reputation of a respected American company.[2] That IBM's portfolio included semiconductor patents is not enough to support comparability. *See, e.g.*, *Lucent*, 580 F.3d at 1328 ("Lucent's brief characterizes the four agreements as covering "PC-related patents," as if personal computer kinship imparts enough comparability to support the damages award."). The Court should exclude: Ex. A ¶¶ 275–276, 277–78, 280–283, 293–297, 304, 306, 308, n.441.[3]

**C. [redacted] Valuation and Arbitration Expert License Rates**

The Court should exclude Mr. Dell's reliance on license rates where no technical or economic comparability has been performed and those rates are, therefore, untethered to the facts of this case. Reliance on license agreements involving third parties, unasserted patents, and third party products requires the proponent to establish that the license is comparable. *See Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1385 (Fed. Cir. 2003) ("Graphic Controls had not shown that the license agreements used in its expert's analysis were in any way comparable

---

[2] IBM has long been recognized as the company with the most patents granted for decades (only recently losing that spot). Ex. P. Mr. Dell's reliance on this "policy" as a benchmark without accounting for the disparity between IBM's vast portfolio and the individual asserted patents highlights his disregard for the comparability requirement.

[3] Mr. Dell includes a one-sentence footnote regarding a Texas Instruments policy that is never referenced again. It should be excluded for the same reasons.

[redacted]

to the '822 patent."); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1017 (N.D. Cal. 2013) (excluding references to patent pool rates because consideration of such rates "expressly requires some degree of comparability" and the expert failed to explain technological or economic comparability between any patent in the patent pools and the hypothetical license); *Integra Lifesciences I, LTD. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003).

Here, Mr. Dell relies on two sets of licenses. The first set comes from a [redacted] with GlobalFoundries' acquisition of IBM's microelectronics business. Ex. A ¶ 270. [redacted] *Id.* ¶ 271. [redacted]. Ex. J at GF_KAT_00003176. [redacted] *Id.* at GF_KAT_00003249. [redacted]. *Id.* [redacted]. *Id.* at GF_KAT_00003177; Ex. A ¶ 273.

Mr. Dell, however, did not analyze [redacted] to determine comparability to the hypothetical negotiation. *E.g.*, Ex. B at 185:16–186:9. He did no analysis of the parties to those agreements and their economic circumstances. Nor did Katana's technical experts perform any analysis to determine whether the licensed technologies, products, and patents were comparable to the '861 and '903 Patents and accused products. *Id.* at 191:25–192:16. Mr. Dell did not account for the passage of time between the decade-plus-old agreements and the 2015 hypothetical negotiation. He performed no analysis to account for these being licenses to entire portfolios whereas the hypothetical negotiation would value only one patent—he does not even

[redacted]

identify the number of patents that were part of each license.[4] Without any of this analysis, these agreements are untethered to the facts of the case.

During his deposition, Mr. Dell argued that he did not need to perform any comparability analysis because [redacted] had already done that analysis. Ex. B at 185:16–25. But as the [redacted] makes clear and Mr. Dell admitted, [redacted] determined [redacted] were similar to the patent groupings [redacted]—not the '861 or '903 Patents. *Id.* at 188:1–9. Mr. Dell admitted "that [comparison to the hypothetical negotiation] wasn't the purpose of the valuation." *Id.* at 188:14. Mr. Dell also suggested that he did not need to perform any comparability analysis because he is relying on these licenses under *Georgia-Pacific* factor 12. Ex. B at 194:4–196:3. But that factor "expressly requires some degree of comparability." *TVI*, 929 F. Supp. 2d at 1017.

Mr. Dell relies on a second set of licenses where, again, no expert has opined that they are economically or technologically comparable. Specifically, Mr. Dell relies on rates identified by the economic expert hired by Katana's former attorneys during arbitration over their compensation. Ex. A ¶ 267; Ex. B at 204:19–205:2. That expert identified agreements that he deemed similar to non-asserted patents that Katana [redacted]. Ex. K at KATANA003314, -316; Ex. A ¶ 267; Ex. B at 205:22–206:4. But no expert analyzed these agreements for economic or technological comparability to the hypothetical negotiations.[5] Ex. B at 206:17–207:1. GlobalFoundries, therefore, respectfully requests that the

---

[4] That [redacted] which Mr. Dell ignores.

[5] The arbitration expert did identify the Numerical Agreement, which is untied to this case as discussed above. That the arbitration expert noted it does not render it any less deficient.

[redacted]

Court exclude: Ex. A ¶¶ 270–274, 264–269, 277–283, 293–297, 304, 306, 308, n.423.

### D. Katana's Offered Rates

Mr. Dell's reliance on the patentee's proposed but rejected license rates should be excluded as unreliable. Proposed license rates have limited value because "patentees could artificially inflate the royalty rate by making outrageous offers." *Whitserve v. Computer Packages, Inc.*, 694 F.3d 10, 29–30 (Fed. Cir. 2012). Here, Mr. Dell relies on Katana's offers in negotiations with [redacted] as support for a [redacted] license rate being the reasonable royalty in this case. Ex. A ¶¶ 177–183. But the hypothetical negotiation approximates what a willing licensor **and** willing licensee would have agreed to. What a licensor offers does not show the rate to which a licensee would have agreed. And no evidence shows that [redacted] agreed to [redacted] per patent.

The evidence shows the opposite. For Samsung, according to Katana's own calculations based on its [redacted] royalty rate, royalties would have been approximately $[redacted] million. Ex. L at KATANA001632. In contrast, [redacted] offered [redacted] as a royalty rate—resulting in approximately [redacted] million in royalties. Ex. M at KATANA001669. But Katana and [redacted] ultimately agreed to compensation of [redacted] million for at least 9 US patents and 12 foreign patents, (Ex. A ¶ 127) as well as the transfer of [redacted] patents that Katana calculated had a market value of $[redacted] (Ex. G at KATANA004348). Thus, [redacted] rejected Katana's offer and the parties ultimately agreed to a rate far below [redacted] per patent. Similarly, for [redacted] according to Katana's own calculation using its [redacted] royalty rate, damages for two patents would have been approximately $[redacted] million. Ex. N at KATANA004068. But Katana and [redacted] ultimately agreed to compensation of [redacted] million for over 40 patents. Ex. A ¶¶ 147, 145. And for [redacted] there has been no license at any rate according to Mr. Dell, and, therefore, no agreement at a rate of [redacted]. Ex. A ¶ 183. The disparity between what Katana offered and what Katana and several of its licensees

[redacted]

ultimately agreed to highlights the unreliability in relying on a patentee's offered (but unaccepted) royalty rates as a basis to determine what a willing licensee would have agreed to at the hypothetical negotiation. The Court should exclude Mr. Dell's reliance on Katana's offered rates: Ex. A ¶¶ 155, 177–184, 293, 296, 306, n.467.

### E. Weighted Average Cost of Capital ("WACC")

Mr. Dell's reliance on GlobalFoundries' weighted average cost of capital ("WACC") should be excluded because it is untied to the facts of the case. Mr. Dell calculates and relies on GlobalFoundries' 6.0% WACC as a basis for the negotiating parameters between Toshiba and GlobalFoundries for the '903 Patent. Ex. A ¶¶ 300–303. He alleges that the WACC provides a "measure of GlobalFoundries financial returns and investment risk profile," and "risk adjusted rates of returns for businesses." *Id.* ¶ 302. As an initial matter, that premise is fundamentally flawed, because the rate of financial return for an investment or business has no relation to a reasonable royalty rate for a patent license to an asserted patent. Mr. Dell broadly asserts that Toshiba and GlobalFoundries would have turned to GlobalFoundries' "financial metrics and financial ratios" to negotiate a reasonable royalty rate, but Mr. Dell provides no explanation for how the WACC would be considered analogous to a reasonable royalty rate. *Id.* ¶ 300.

According to Mr. Dell's own description, GlobalFoundries' WACC is not tied to the facts of the case. Specifically, WACC "represents a company's **<u>average</u>** after-tax cost of capital from **<u>all sources</u>**, including common stock, preferred stock, bonds, and other forms of debt." *Id.* ¶ 302 (emphasis added). He alleges that the WACC "represents the **<u>average rate</u>** that a company must pay to finance its business and operations, as well as the rate of return shareholders and lenders require from the company in exchange for their investment." *Id.* (emphasis added). In other words, according to Mr. Dell himself, WACC is an average that applies to all sources of capital, not to "the development efforts directly attributed to the wafers manufactured related to GlobalFoundries

[redacted]

development efforts," as Mr. Dell alleges is the reason the parties would even turn to the WACC. *Id.* ¶ 300. Nor is the WACC tied to patents, research and development, or the commercialization of particular technologies. There is no showing the WACC is tied to the '903 Patent or even comparable technology. Instead of a reliable, valid method applied to the facts of the case, Mr. Dell's reliance on GlobalFoundries' WACC is Mr. Dell's attempt to use an unrelated, untethered economic metric. As used by Mr. Dell, GlobalFoundries' WACC could be applied to every case involving GlobalFoundries, regardless of the counterparty and regardless of the technology. That is not a reliable or principled method and the Court should exclude: Ex. A ¶¶ 300, 302–304.

### F. Mr. Dell Failed to Reliably Apportion to the Value of the Patented Inventions

Even if the above data points were to meet the threshold level of comparability necessary for Mr. Dell to rely on them, Mr. Dell's analysis still fails because he has not apportioned. The patentee must "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features using reliable and tangible evidence." *Ericcson*, 773 F.3d at 1226 (internal quotation marks omitted). "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.*; *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1345 (Fed. Cir. 2023) ("Any reasonable royalty must seek to measure the value of the patented technology—it must be 'apportioned' to that value—by separating out and excluding other value in economic products or practices.") (cleaned up and citation omitted).

Mr. Dell must determine the portion of the revenue attributable to the '861 and '903 Patents and nothing else. Mr. Dell must consider that the '861 Patent covers, at most, one of the at least 1,000 innovations used in manufacturing the accused GlobalFoundries's products. Ex. F ¶ 511. Even amongst those 1,000-plus innovations, a proper analysis would have accounted for the relative importance of the '861 Patent, which GlobalFoundries contends is a tier-three

[redacted]

innovation—the lowest level of importance and impact compared to the myriad tier one and two innovations in GlobalFoundries' products. Ex. F ¶¶ 519–524, 545–548. Mr. Dell also needed to consider the relationship of the '861 Patent's inventions to the significant innovations that go into the accused products, including the 3D (as opposed to planar) FinFET structure and the change in gate dielectric material. Ex. F ¶¶ 532–536. Likewise, for the '903 Patent, Mr. Dell needed to consider that it covers only a "very narrow arrangement" of one feature. Ex. F ¶ 828. And Mr. Dell needed to account for GlobalFoundries' significant investments incurred in the plant, tools, and manufacturing process technology development and manufacturing operations required to ultimately make the accused products. Ex. E ¶ 256.

Here, Mr. Dell's report lacks any apportionment analysis. Instead, Mr. Dell states that the market indicators discussed in his report "already considered apportionment," and contends that those market agreements are "already inherently apportioned." Ex. A ¶¶ 296, 335; Ex. B at 277:25. In other words, Mr. Dell is relying on the principle that "a damages theory that is dependent on a comparable license (or a comparable negotiation) may **<u>in some cases</u>** have 'built-in apportionment.'" *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed Cir. 2021) (emphasis added) (citation omitted); *MLC Intellectual Prop., LLC v. Micron Tech.*, 10 F.4th 1358, 1374 (Fed. Cir. 2021). But as the Federal Circuit has made clear, reliance on comparable licenses does not automatically account for apportionment. The proponent must show that the relationship between the comparable and hypothetical licenses are so close such that apportionment is built-in. *See Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040–41 (Fed. Cir. 2020) (allowing built-in apportionment where the comparable was between the **<u>same</u>** parties, from six years earlier, the infringing product was the same, the license covered "roughly very similar technologies," and the accused infringer's expert admitted that the agreement was "a very close comparable, much

[redacted]

closer than you ever find in a patent case”); *Commonwealth Scientific and Industrial Research Organisation v. Cisco Systems, Inc.*, 809 F.3d 1295, 1301–04 (Fed. Cir. 2015) (negotiations relied upon were between the same parties, over just the asserted patent, and included an offer by the licensee, which could provide an apportioned starting point, and categorical exclusion risked excluding what could be “the most effective method of estimating the asserted patent’s value” in some cases); *Elbit Systems Land and C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1300 (Fed. Cir. 2019) (comparable license involved the accused infringer as licensor, was within 4 months of the hypothetical negotiation, and involved closely related technologies—one way satellite communication technology in the comparable license and two way satellite communication technology at the hypothetical negotiation). In considering whether a license involving third parties and unasserted patents has built-in apportionment, the Federal Circuit has examined whether the proponent has shown “that the proportion of licensed/unlicensed features [in the products covered by the third party license] was comparable to the present case.” *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1377 (Fed. Cir. 2020).

Here, neither Mr. Dell nor any other Katana expert has performed the necessary analysis to establish that the Numerical Agreement or any other data point is sufficiently comparable to the hypothetical negotiation such that built-in apportionment applies. None of the data points involve the parties to the hypothetical negotiation. There is no opinion that they involved closely related technologies—only that the ’861 Patent is technologically comparable to the Numerical Agreement. And even if Katana had put forth evidence showing a close relation in technologies, there is no evidence that the proportion of licensed/unlicensed features was comparable between the Numerical Agreement from 2000 and the 2015 hypothetical negotiation. *Bio-Rad*, 967 F.3d at 1377; *see also, e.g.*, *Mondis Tech. Ltd. v. LG Elecs., Inc.*, 2021 WL 4077563, at *3-4 (D.N.J. Sept.

[redacted]

8, 2021); *NNCrystal US Corp. v. Nanosys, Inc.*, 2023 WL 2891453, at *3-4 (D. Del. Apr. 11, 2023). Katana's technical expert admitted that she did not analyze this proportion of licensed to unlicensed features. Ex. D at 224:11–16, 245:2–8. And there is no precedent for relying on general industry license rates to apportion for specific patents. For the '903 Patent, there is no analysis of how an average cost of capital across an entire company can reliably apportion for a specific patent. And finally, the Federal Circuit has directly addressed whether a patentee's own offers reliably apportion—they do not. *Omega*, 13 F.4th at 1379 (basing apportionment on patentee's "generic licensing arrangement" would improperly permit the patentee to hide behind that policy to avoid the task of apportionment).

Finally, far from being the "most effective method" of ascertaining the asserted value in this case (*CSIRO*, 809 F.3d at 1303–04), the market data points relied upon by Mr. Dell pale in comparison to the multiple transactions and license agreements entered into that include the actual asserted patents. For example, that [redacted]—one of the parties to the hypothetical negotiation—[redacted] (*see* II.A above) is far more probative in apportioning the value of the '861 Patent than any other data point relied on by Mr. Dell. Similarly, that [redacted] in 2019 is more reliable than any input relied on by Mr. Dell. *Id.* Mr. Dell also discounts the patent license agreements entered into by GlobalFoundries—a party to the hypothetical negotiation—for rates far below [redacted]. GlobalFoundries licensed over [redacted] patents for [redacted] million—approximately [redacted] per patent. Ex. E ¶ 385. And Katana's own valuation of the '903 Patent's value is far more probative of its value than Mr. Dell's data points. Thus, even if Mr. Dell's data points satisfy the threshold level of comparability, they are not sufficiently

[redacted]

comparable to the hypothetical negotiation to satisfy the apportionment requirement.

Mr. Dell highlights his failure to apportion by relying on GlobalFoundries' documents that describe improvements in ***entire nodes*** as purporting to support his opinions regarding the '861 Patent. Specifically, Mr. Dell identifies a GlobalFoundries' datasheet relating to its 14LPP node and a 2017 press release on its 12LPP. Ex. A ¶¶ 217–219. Mr. Dell notes that those documents describe benefits like improved device performance, power reduction, and improved density. *Id.* ¶ 217. But rather than acknowledge that these documents describe entire manufacturing process nodes that include thousands of inventions, Mr. Dell describes those documents as "tout[ing] the benefits of the '861 patent." *Id.* But no GlobalFoundries document ties general improvements in its process technologies to the '861 Patent; nor has any expert opined that those improvements are due to the '861 Patent. Ex. D at 203:25-206:6. The '861 Patent is, at most, one minor innovation. Mr. Dell ignores that distinction—again, failing to apportion. His reliance on datasheets and press releases associated with entire node technologies highlights that failure.

The Court should exclude: Ex. A ¶¶ 217–219, 221, 293–297, 300, 302-304, 306, 308.

* * *

Because Mr. Dell's conclusions and calculations rely on underlying bases that should be excluded, they also should be excluded: Ex. A ¶¶ 30, 32, 315-329, 330-347, Attachments 3A–6B.

## V. CONCLUSION

The parties produced significant direct evidence showing the low value of the asserted patents—including Katana's licenses, Katana's own patent valuation, and more than ten comparable GlobalFoundries' licenses. But Mr. Dell ignored that evidence to inflate damages by relying on a software agreement from 15 years before the hypothetical negotiation and other data points lacking any relation to this case. The Court should exercise its gatekeeper role and prevent Mr. Dell from presenting these opinions to unduly and unfairly inflate damages in front of the jury.

[redacted]

Dated: February 6, 2025

Respectfully submitted,

By: */s/ Allan M. Soobert*

Allan M. Soobert (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
Telephone: (202) 551-1822
Facsimile: (202) 551-0222
allansoobert@paulhastings.com

Joseph J. Rumpler, II (*pro hac vice*)
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
Telephone: (650) 320-1800
Facsimile: (650) 320-1900
josephrumpler@paulhastings.com

Soyoung Jung (*pro hac vice*)
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071
Telephone: (213) 683-6211
Facsimile: (213) 996-3211
soyoungjung@paulhastings.com

Paige A. Amstutz
Texas State Bar No. 00796136
E-mail: pamstutz@scottdoug.com
Lauren Ditty
Texas State Bar No. 24116290
E-mail: lditty@scottdoug.com
SCOTT, DOUGLAS & MCCONNICO, LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399

*Counsel For Defendants Globalfoundries Inc., Globalfoundries U.S. Inc., and Globalfoundries U.S. 2 LLC*

[redacted]

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule CV-7(g), counsel for the parties to this motion conferred in a good-faith effort on February 6, 2025, to resolve the matter presented herein. Counsel for Plaintiff opposes the instant motion.

*/s/ Allan M. Soobert*
Allan M. Soobert

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of February, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record. Any documents filed under seal were served by email.

*/s/ Allan M. Soobert*
Allan M. Soobert