**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| KATANA SILICON TECHNOLOGIES LLC, | |
| Plaintiff, | |
| v. | Case No. 1:22-CV-00852-ADA |
| GLOBALFOUNDRIES, INC.; GLOBALFOUNDRIES U.S. INC.; and GLOBALFOUNDRIES U.S. 2 LLC | |
| Defendants. | |

**DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A
MATTER OF LAW OF REDUCED DAMAGES**

███████████████████████████

# TABLE OF CONTENTS

**Page**

I.  Introduction ........................................................................................................... 1

II.  Background ............................................................................................................ 2

    A.  Katana's damages case rests on a production license from 15 years  before
        the hypothetical negotiation. ........................................................................ 2

    B.  GlobalFoundries' expert relied on market transactions for the asserted
        patents, including one by the licensor at the hypothetical negotiation. ................ 6

III.  Legal Standard ...................................................................................................... 6

    A.  Judgment as a matter of law is proper when there is insufficient evidence
        to support the jury's finding ......................................................................... 6

    B.  Black letter law requires apportionment. ..................................................... 7

        1.  Built-in apportionment exists only under certain circumstances. .............. 7

        2.  Apportionment of the royalty base does not end with identifying
            the smallest salable patent practicing unit. ................................................ 8

IV.  Argument .............................................................................................................. 8

    A.  Katana and Dell failed to properly apportion the royalty rate. ............................ 8

        1.  The 2000 Numerical Production License royalty rate is not
            apportioned to the value of the asserted patent's invention. ...................... 9

            a.  Katana failed to show that the Numerical 1.25% royalty
                rate is for a license to a single patent. .......................................... 9

                (1)  Dell ignored rights to other patents.................................... 9

                (2)  Dell ignored the Numerical software rights.................... 10

            b.  Katana failed to show built-in apportionment. ........................... 11

        2.  Dell's remaining data points do not apportion.......................................... 15

    B.  Katana and Dell failed to properly apportion the royalty base. .......................... 15

    C.  Dell ignored the market evidence tied to the '861 patent. .................................. 17

    D.  The proper remedy for Katana's failure to apportion is to limit damages to
        the amount supported by substantial evidence.................................................... 19

V.  Conclusion .......................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraham v. Alpha Chi Omega,*
  708 F.3d 614 (5th Cir. 2013) ....................................................................6

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.,*
  967 F.3d 1353 (Fed. Cir. 2020)...........................................................8, 12

*Commonwealth Sci. and Indus. Res. Org. v. Cisco Sys., Inc.,*
  809 F.3d 1295 (Fed. Cir. 2015).............................................................7, 11

*Ecofactor, Inc. v. Google LLC,*
  137 F.4th 1333 (Fed. Cir. 2025) (en banc) ............................................18

*Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys., LLC,*
  927 F.3d 1292 (Fed. Cir. 2019)..........................................................7, 12

*Eli Lilly & Co. v. Aradigm Corp.,*
  376 F.3d 1352 (Fed. Cir. 2004)................................................................7

*Ericcson, Inc. v. D-Link Sys., Inc.,*
  773 F.3d 1201 (Fed. Cir. 2014)...............................................................7

*Finjan, Inc. v. Blue Coat Sys., Inc.,*
  879 F.3d 1299 (Fed. Cir. 2018)..............................................................20

*Jiaxing Super Lighting Elec. Appliance, Co. v. CH Lighting Tech. Co., Ltd,*
  146 F.4th 1098 (Fed. Cir. 2025) .......................................................10, 11

*Lucent Techs. Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009)..............................................................15

*MLC Intellectual Prop., LLC v. Micron Tech.,*
  10 F.4th 1358 (Fed. Cir. 2021) ................................................................7

*Omega Patents, LLC v. CalAmp Corp.,*
  13 F.4th 1361 (Fed. Cir. 2021) ....................................................7, 11, 15

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
  904 F.3d 965 (Fed. Cir. 2018)...................................................8, 15, 16, 17

*Promega Corp. v. Life Techs. Corp.,*
  875 F.3d 651 (Fed. Cir. 2017)................................................................20

*TGIP, Inc. v. AT&T Corp.*,
  527 F. Supp. 2d 561 (E.D. Tex. 2007) .......................................................................6

*Tronzo v. Biomet, Inc.*,
  236 F.3d 1342 (Fed. Cir. 2001)............................................................................19

*Vectura Ltd. v. GlaxoSmithKline LLC*,
  981 F.3d 1030 (Fed. Cir. 2020)........................................................................7, 11

*VirnetX, Inc. v. Cisco Sys. Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014)............................................................................8

*VLSI Tech. LLC v. Intel Corp.*,
  87 F.4th 1332 (Fed. Cir. 2023) ...........................................................................7

**Rules**

Fed. R. Evid. 702 ......................................................................................1, 2

**Other**

Petition for Writ of Certiorari, *R.J. Reynolds Vapor Co. v. Altria Client Servs.
  LLC*, No. 25-158, 2025 WL 2324744 ...............................................................14

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | July 2025 Trial Transcript in *Katana Silicon Techs. LLC v. GlobalFoundries Inc., et al.*, No. 1:22-cv-852-ADA (Excerpted and Highlighted) |
| B | May 13, 2025 Pretrial Conference Transcript in *Katana Silicon Techs. LLC v. GlobalFoundries Inc., et al.*, No. 1:22-cv-852-ADA (Excerpted and Highlighted) |
| D-889 | U.S. Patent No. 6,258,493 (Highlighted) |
| D-890 | U.S. Patent No. 6,420,074 (Highlighted) |
| D-891 | U.S. Patent No. 5,858,580 (Highlighted) |
| P-17 | Numerical Technologies, Inc. Production License (Highlighted) |
| P-27 | Patent Rights Purchase and Assignment Agreement between Sharp Corporation and Katana Silicon Technologies LLC ("Katana") (Highlighted) |
| P-28 | KPMG Valuation Analysis of Certain Identified Tangible and Intangible Assets of IBM's Microelectronics Division (Excerpted) |
| P-29 | Exhibit 11 to Expert Report of Eric T. Carnick of Ocean Tomo in *Spence P.C. v. Nordic Interactive Technologies, LLC, et al.* |
| P-33 | Longhorn IP ("Longhorn") Business Presentation to Samsung (Highlighted) |
| P-72 | License Agreement between Katana and Taiwan Semiconductor Manufacturing Company Ltd. ("TSMC") |
| P-73 | Settlement and Patent License Agreement Between Katana and Longhorn and Samsung Electronics Co., Ltd. (Highlighted) |
| P-74 | Settlement and Patent License Agreement Between Katana and United Microelectronics Corporation (Highlighted) |
| P-75 | Settlement and Patent License Agreement Between Katana and Kioxia Corporation |
| P-88 | Settlement and Patent License Agreement Between Katana and Sk Hynix Inc. |
| P-90 | Settlement and Patent License Agreement Between Katana and Western Digital Technologies, Inc. |

## I.    INTRODUCTION

To opine that the value of the '861 patented feature at a 2015 hypothetical negotiation between Sharp and GlobalFoundries was $19.8 million, Katana relied on a production license from 2000 between Numerical Technologies Inc. ("Numerical") and United Microelectronics Corporation ("UMC"). To do so, Katana and its expert Mr. Stephen Dell ("Dell") had to ignore multiple licenses by Sharp of the '861 patent, disregard Sharp's sale of the '861 patent, and brush aside multiple licenses by Katana of the '861 patent. Katana and Dell also had to skip over every semiconductor industry license going back to 2000 to land on the 2000 Numerial agreement. When GlobalFoundries challenged this theory under Rule 702, the Court was "a little troubled by the apportionment" and reserved ruling on whether the theory was "adequate or not" until after trial. Even after a chance to supplement, Katana proceeded to trial with its damages theory hinged on the 2000 Numerical agreement. Katana did not attempt to apportion and, instead, relied on purported "built-in" apportionment of the 2000 Numerical agreement for that critical issue.

At trial, Katana and Dell's evidentiary failures manifested in multiple ways. First, the royalty rate Katana advanced from the 2000 Numerical agreement was not apportioned to the value of the '861 patent at the 2015 hypothetical negotiation. Dell improperly imported the Numerical rate by ignoring that the Numerical agreement licensed multiple categories of patents, as well as valuable software and documentation. Instead, contrary to the evidence, he opined that the Numerical royalty was only for the '580 patent. But even if that were true, Dell still failed to meet the demanding built-in apportionment standard because of the disparity between the '580 and '861 patents—the former covering a lithography technique and the latter covering a specific transistor configuration. Second, Dell failed to use an adequately apportioned royalty base by relying on entire semiconductor wafer revenue, even though it is undisputed that a wafer has valuable noninfringing features. Third, Dell only got to the 2000 Numerical agreement by ignoring or

disregarding data points tied to the '861 patent and the hypothetical negotiation.

In contrast, GlobalFoundries' expert relied on substantial evidence tied to the '861 patent in opining that damages would be no more than $1.0 million. Because Katana has already had multiple chances to try to fix its misguided damages theory and still presented a theory that lacked substantial evidence on apportionment, the proper remedy is to award damages limited to what the evidence supports. GlobalFoundries, therefore, moves for judgment as a matter of law and respectfully requests that the Court reduce the $9.2 million jury damages award to $1.0 million.

## II.     BACKGROUND

### A.     Katana's damages case rests on a production license from 15 years before the hypothetical negotiation.

Damages in this case turn on what Sharp and GlobalFoundries would have agreed to for a license to the '861 patent at a hypothetical negotiation in 2015. Ex. A at 385:1–17. To answer that question, Katana and its damages expert hinged their damages theory on an agreement executed in 2000 involving different patents, software, and neither of those parties. Katana served the opening Dell expert report advocating this theory. GlobalFoundries moved to exclude it under Rule 702 because the theory relied on data points untied to the facts of this case and failed to apportion. Dkt. 146. While the Court denied that motion, the Court was "a little troubled by the apportionment" theory. Ex. B at 36:21–22. The Court granted Dell the opportunity to supplement his report on apportionment and reserved ruling on whether the theory was "adequate or not" until after hearing it at trial. *Id.* at 37:1–17. But because of the fundamental disconnect between Dell's damages theory and the hypothetical negotiation, no supplementation could cure the deficiencies. Katana, therefore, presented a damages case that was unsupported by substantial evidence.

At trial, Katana and Dell argued that Sharp and GlobalFoundries would have agreed to a royalty rate of 1.25% of GlobalFoundries' revenue for the accused semiconductor wafers. Ex. A

at 432:21–24. They based this damages theory primarily on an agreement between Numerical and UMC executed in 2000. *Id.* at 432:17–20; P-17. Section 4.1 of that agreements states that in consideration for licenses granted pursuant to Section 2.1 and 2.2, UMC would pay Production Royalties on Royalty Bearing Wafers at a Royalty Rate:

> <u>Production Royalties</u>. In consideration of the license granted pursuant to Section 2.1 and 2.2 and the right to undertake production granted therewith, UMC agrees to pay Numerical Technologies the Production Royalties according to the following formula:
>
> Number of Royalty Bearing Wafers x Average Sale Price x Royalty Rate = Production Royalties

P-17.4; Ex. A at 418:1–8. Section 2.1 is the "Patent License" that grants rights under the PSM Patents. P-17.3. And Section 2.2 includes "Copyright Licenses" that relate to software and related documentation and scripts. P-17.3. "Royalty Bearing Wafers" are defined as production wafers that (i) infringe the U.S. patent 5,858,580 . . ., or (ii) infringe any other PSM Patent . . . ." P-17.2 "PSM Patents," in turn, is defined to include three categories of patents:

> "PSM Patents" means U.S. Patent No. 5,858,580 (and any continuations or divisional applications thereof, and any foreign counterparts thereto), and any other semiconductor process patent owned or controlled by Numerical Technologies that is useful or necessary to use or implement PSM Technology."

P-17.2. The Royalty Rate is identified in Exhibit A and is based on the number of annual wafer sales. P-17.14. Taken together, the production royalties are in consideration of a patent license (for multiple patents) and copyright licenses for software and related documentation. Nevertheless, based on testimony from its technical expert Dr. Kelin Kuhn ("Kuhn") and Dell, Katana advocated at trial that GlobalFoundries should pay the same royalty rate for a license to the '861 patent.

Kuhn testified regarding U.S. Patent No. 5,858,580 (the "'580 patent") that was licensed as part of the Numerical agreement. D-891. She described the '580 patent as a "lithography patent" and, more specifically, a "phase shift mask patent." Ex. A at 273:20, 274:19–20. In other words,

the '580 patent is a fabrication patent—not a patent on a specific structure like the asserted '861 patent. *E.g.*, *id.* at 299:9–16. Kuhn tried to bridge the difference between the '580 and '861 patents by asserting that phase shift masks were used to print "layers in the transistor." *Id.* at 274:11–275:7. But beyond that superficial recitation, all Kuhn's opinion boiled down to is that the '580 patent enabled some of the same generic benefits as she alleged the '861 patent enabled. *Id.* at 273:2–15. For example, she asserted both patents are "directed to transistor-level performance improvements which ultimately end up in higher speed and lower power consumption and device miniaturization." *Id.* at 275:4–7; *see also id.* at 277:10–11, 277:18–20, 278:6–8. Furthermore, Kuhn testified that the '580 patent addressed "a little slice of the lithography world." *Id.* at 280:14–15. But she never offered testimony comparing the ratio of inventions covered by the '580 patent to the features of a wafer.

Dell relied on Kuhn's testimony to testify that the Numerical agreement is comparable to the hypothetical negotiation based on the '580 patent. *Id.* at 419:12–25; P-17. Notably, Dell repeated Kuhn's benefits-based comparability analysis. *Id.* at 419:19–23. Dell opined that it was a license for a single patent. *See, e.g.*, *id.* at 412:20–24, 428:10–25. In other words, despite the agreement language, he opined that the Numerical agreement royalty rate was solely compensation for a single patent license. But Section 4.1 directly states that the royalties are for both patent and copyright licenses related to software. And even ignoring all software aspects of the agreement—licensed patents explicitly included two categories of patents in addition to the '580 patent. P-17.2; Ex. A at 472:6–15. Nevertheless, Dell treated this agreement as a one-patent license and calculated a 1.25% royalty rate per infringing wafer—totaling about $19.8 million. *Id.* at 421:4–11, 371:23–

372:1. Dell used wafer revenue as his royalty base[1] despite undisputed evidence that a wafer has many valuable features besides what the '861 patent covers. And no witness testified that the patented feature drove demand for the wafer.

To bolster his opinion, Dell introduced other industry licensing data points under *Georgia-Pacific* factor 12, as well as Katana's own licensing offers. The industry data points included an expert report exhibit prepared by an expert from Ocean Tomo in another matter to value other patents that provided semiconductor industry licensing data points. *Id.* at 422:2–15; P-29. He similarly relied on a KPMG valuation performed for GlobalFoundries to value groups of thousands of patents. Ex. A at 424:16–425:15; P-28. He then turned to IBM's 1 percent per patent up to 5 percent licensing policy. *Id.* at 425:16–426:25. Dell never discussed any specific license from any of these sources (other than the Numerical agreement listed in the Ocean Tomo exhibit). And Kuhn never offered any technological comparability opinion for these data points (again, except for the Numerical '580 patent). Finally, Dell relied on Katana's own desired royalty rates (*id.* at 406:23–407:12), which were repeatedly rejected—as shown by multiple licenses at rates far lower than what Katana wanted and offered. *Compare, e.g.*, P-33.31 (seeking $205 million) *with* P-73.7 (agreeing to accept $5 million).

On the critical issue of apportionment, Katana attempted to rely on "built-in" apportionment. Specifically, Katana contended that the 2000 Numerical agreement has built-in apportionment. Ex. A at 430:18–431:12. Dell relied on Kuhn for comparability of the '580 patent. But Kuhn never provided the analysis that would allow reliance on a 15-year-old agreement involving different technology, different patents, and different parties to apportion for the value of

---

[1] *See, e.g.*, Ex. A at 379:20–380:5. GlobalFoundries lodged a continuing objection to this figure. *Id.* at 7:20–8:1, 8:20–9:4.

the '861 patent. Kuhn never testified that the proportion of licensed technology in a wafer under the Numerical agreement is the same as at the hypothetical negotiation. And Dell did not—and could not—offer any opinion that any other data point satisfied the apportionment requirement. Indeed, he compounded his apportionment failure by ignoring or disregarding numerous data points directly tied to the value of the '861 patent, including licenses by Sharp to other semiconductor companies for the '861 patent, Sharp's sale of the '861 patent, and what Katana and semiconductor companies ultimately agreed to in licenses including the '861 patent.

### B. GlobalFoundries' expert relied on market transactions for the asserted patents, including one by the licensor at the hypothetical negotiation.

In contrast, GlobalFoundries' expert Dr. Stephen Becker ("Becker") presented evidence that any damages should be no more than a lump-sum payment of $1 million. Ex. A at 790:4–15. Becker came to that conclusion by relying on multiple data points involving the specific asserted '861 patent. Specifically, Becker relied on Sharp's sale of the '861 patent and licenses that included the '861 patent between Katana and Samsung and UMC. *Id.* at 824:11–825:18. These transactions all included the specific asserted patent and were executed within a few years of the hypothetical negotiation. *Id.* at 802:10–810:5, 816:7–822:2. And the Sharp sale included the licensor at the hypothetical negotiation. *Id.* at 807:18–808:13.

## III.   LEGAL STANDARD

### A.   Judgment as a matter of law is proper when there is insufficient evidence to support the jury's finding.

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The jury verdict is reviewed under the "substantial evidence" rule. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004) (citation omitted).

### B.    Black letter law requires apportionment.

The patentee must "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features using reliable and tangible evidence." *Ericcson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (internal quotations omitted). "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.*; *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1345 (Fed. Cir. 2023) ("Any reasonable royalty must seek to measure the value of the patented technology—it must be 'apportioned' to that value—by separating out and excluding other value in economic products or practices.") (citation modified).

### 1.    Built-in apportionment exists only under certain circumstances.

"[A] damages theory that is dependent on a comparable license (or a comparable negotiation) may **in some cases** have 'built-in' apportionment.'" *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021) (citation modified); *MLC Intellectual Prop., LLC v. Micron Tech.*, 10 F.4th 1358, 1374 (Fed. Cir. 2021). The proponent must show that the relationship between the comparable and hypothetical licenses are so close that apportionment is built-in. *See Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040–41 (Fed. Cir. 2020) (allowing built-in apportionment where the comparable license was between the **same** parties, from six years earlier, the infringing product was the same, the license covered "roughly very similar technologies," and the accused infringer's expert admitted that the agreement was "a very close comparable, much closer than you ever find in a patent case"); *Commonwealth Sci. and Indus. Res. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301–04 (Fed. Cir. 2015) ("*CSIRO*"); *Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1300 (Fed. Cir. 2019). In considering

whether a license involving third parties and unasserted patents has built-in apportionment, the Federal Circuit has examined whether the proponent has shown "that the proportion of license/unlicensed features [in the products covered by the third-party license] was comparable to the present case." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1377 (Fed. Cir. 2020).

### 2. Apportionment of the royalty base does not end with identifying the smallest salable patent practicing unit.

"A patentee's obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features." *VirnetX, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). Instead, to rely on the market value of an entire apparatus, the patentee must show that the patented feature constitutes the basis of demand. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 978 (Fed. Cir. 2018). This "entire market value" rule is a "demanding alternative" to the general rule of apportionment. *Id.* at 977. Patentees must "apportion the royalty down to a reasonable estimate of the value of its claimed technology unless it can establish that its patented technology drove demand for the entire product." *Id.* at 978 (citation modified). "Strict requirements limiting the entire market value exception ensure that a reasonable royalty does not overreach and encompass components not covered by the patent." *Id.* (citation modified).

## IV. ARGUMENT

### A. Katana and Dell failed to properly apportion the royalty rate.

Katana and Dell's royalty rate is not supported by substantial evidence because it is not apportioned to the value of only the infringing feature at the 2015 hypothetical negotiation. Instead, Katana and Dell relied on a 2000 production license with no connection to the hypothetical negotiation to try—but fail—to show built-in apportionment. And the other data points that Katana and Dell presented also do not apportion for the value of the '861 patent.

**1.    The 2000 Numerical Production License royalty rate is not apportioned to the value of the asserted patent's invention.**

Katana's reliance on the 2000 Numerical agreement fails for two independent reasons. First, neither Katana nor Dell showed that it was proper to dedicate the entire 1.25% royalty rate from that agreement to a single patent—the '580 patent. Second, even if that were proper, Katana and Mr. Dell failed to show that the 2000 Numerical license and '580 patent are so comparable to the hypothetical negotiation for the '861 patent that there was built-in apportionment.

  a.  **Katana failed to show that the Numerical 1.25% royalty rate is for a license to a single patent.**

Dell and Katana erred by improperly concluding that the Numerical agreement royalty rate was for a license to a single patent without evidentiary support. *See, e.g.*, Ex. A at 412:20–24, 428:10–25. To do so, Dell ignored that the production royalty rate from the Numerical agreement was in consideration for (1) rights to multiple patents in addition to the '580 patent and (2) valuable software and other rights via copyright licenses.

  (1)  **Dell ignored rights to other patents.**

The Numerical agreement grants UMC a license to three categories of patents:

> "PSM Patents" means
> **[1]** U.S. Patent No. 5,858,580 (and
> **[2]** any continuations or divisional applications thereof, and any foreign counterparts thereto), and
> **[3]** any other semiconductor process patent owned or controlled by Numerical Technologies that is useful or necessary to use or implement PSM Technology."

P-17.2; Ex. A at 471:15–472:3, 487:3–10. Based on the definition of PSM patents, in addition to licensing the '580 patent, the Numerical agreement also granted rights to "any continuations or divisional applications thereof, and any foreign counterparts thereto." P-17.2. And the Numerical agreement granted rights to "any other semiconductor process patent owned or controlled by Numerical Technologies that is useful or necessary to use or implement PSM Technology." *Id.*

But despite UMC receiving rights to these three categories of patents, Dell did not account for patents in the second and third categories. That is, Dell acknowledged that the Numerical royalty was for "divisionals and continuations" of the '580 patent. Ex. A at 487:3–6. And there was uncontroverted evidence at trial that multiple such patents existed during the term of the Numerical agreement. *Id.* at 831:20–832:21; D-889; D-890. Despite the contractual language and evidence, Dell gave no value to these continuations and divisional applications. *E.g.*, Ex. A at 489:12–16. Similarly, Dell did not determine if there were any patents that fell into the third category. *Id.* at 474:1–8, 475:21–25, 476:6–11. He did not look at Numerical's patent portfolio. *Id.* at 473:5–8. He never testified that anybody else did that search for him. And when confronted with other Numerical patents, he could not say whether they fell into that third category. *See, e.g.*, *id.* at 476:12–483:3. Instead, he just looked at the agreement and relied on the fact that category 1 (of 3) only listed the '580 patent. *Id.* at 472:16–23. Because Dell ignored these other patents, he erred by dedicating the entire royalty from the Numerical agreement to the '580 patent and assigning zero value to all other licensed patents. *Id.* at 489:12–16; *see, e.g.*, *Jiaxing Super Lighting Elec. Appliance, Co. v. CH Lighting Tech. Co., Ltd*, 146 F.4th 1098, 1112 (Fed. Cir. 2025) ("[E]xpert testimony should be excluded when it fails to allocate license fees among the licensed patents covered by an agreement.").

(2)    <b>Dell ignored the Numerical software rights.</b>

Dell also opined that the royalty rate in the Numerical agreement was entirely separate from the software rights granted to UMC. But the Numerical agreement specifies the royalties due were in consideration of patent and copyright licenses. Section 4.1 defining the royalties states:

> Production Royalties. **In consideration of the license granted pursuant to Section 2.1 and 2.2** and the right to undertake production granted therewith, UMC agrees to pay Numerical Technologies the Production Royalties according to the following formula:

Number of Royalty Bearing Wafers x Average Sale Price x Royalty
Rate = Production Royalties

P-17.4 (emphasis added). Section 2.1 is the "Patent License" that grants rights under the PSM

Patents. P-17.3. And Section 2.2 includes "Copyright Licenses" that grant rights regarding, *inter

alia*, the PSM Software, PSM Documentation, and UMC Scripts and Flows. *Id.*; Ex. A at 484:7–

485:13. Taken together, the plain language shows the production royalties in Section 4.1 are in

"consideration of the license granted pursuant to Section 2.1 [Patent License] and 2.2 [Copyright

Licenses] and the right to undertake production granted therewith." P-17.4. Dell acknowledged

that if Section 4.1 contained rights besides a license to the '580 patent, he would need to determine

what value to assign to those additional rights. Ex. A at 488:25–489:6. But despite that admission

and the language of Section 4.1—which states the royalties are in consideration for copyright and

patent rights—Dell assigned all the value of the royalties to the '580 patent. He did not assign any

portion to the software or other copyright licenses provided by the agreement. *Id.* at 486:11–16.

### b.    Katana failed to show built-in apportionment.

Even if the Numerical royalty rate were for a one-patent license to the '580 patent, Dell

failed to meet the demanding standard for built-in apportionment. "A damages theory that is

dependent on a comparable license (or a comparable negotiation) may **in some cases** have built-

in apportionment.'" *Omega*, 13 F.4th at 1377 (emphasis added) (citation modified).

Federal Circuit cases endorsing built-in apportionment involve circumstances that are not

present here. For example, in *Vectura*, the comparable license was between the same parties as the

hypothetical negotiation, the infringing product was the same, the license covered "roughly very

similar technologies," and the accused infringer's expert admitted that the agreement was "a very

close comparable, much closer than you ever find in a patent case." 981 F.3d at 1040–41. In

*CSIRO*, the Federal Circuit allowed reliance on royalties discussed in a negotiation between the

same parties as the hypothetical negotiation, over the same asserted patent, and that included an offer by the accused infringer—which could provide an apportioned starting point for negotiation. 809 F.3d at 1301–04. And in *Elbit Systems*, the comparable license involved the accused infringer as the licensor, was within 4 months of the hypothetical negotiation, and involved closely related technologies—one-way versus two-way satellite communication. 927 F.3d at 1300.

And in *Bio-Rad*, the Federal Circuit considered whether a license involving third parties and unasserted patents had built-in apportionment. 967 F.3d at 1377. In finding there was built-in apportionment, the Federal Circuit examined whether the proponent showed "that the proportion of licensed/unlicensed features [in the products covered by the third-party license] was comparable to the present case." *Id.* In other words, to show built-in apportionment, the proponent must show that the ratio of features covered by the asserted patent in the infringing product is comparable in value to the ratio of features covered by the patent licensed in the third party license to the product licensed in the third-party license:

$$\frac{Value\ of\ Asserted\ Patent\ Feature}{Value\ of\ Total\ Accused\ Device} \sim = \frac{Value\ of\ Feature\ Licensed\ in\ Third-Party\ License}{Value\ of\ Total\ Device\ in\ Third-Party\ License}.$$

Here, neither Dell nor Kuhn performed the necessary analysis to establish that the 2000 license between Numerical and UMC was so comparable to the 2015 hypothetical negotiation between Sharp and GlobalFoundries that apportionment was "built-in." The agreement does not involve any of the parties to the hypothetical negotiation. They do not involve closely related technologies. And, critically, there is no evidence showing that the proportion of licensed to unlicensed features in a wafer under the 2000 Numerical agreement is comparable to the proportion of the features of the wafer covered by the '861 patent to the overall features of a wafer at the 2015 hypothetical negotiation. *Bio-Rad*, 967 F.3d at 1377. Katana did not present testimony from Dell or Kuhn establishing that the proportion was comparable.

Kuhn tried to establish a relationship between the '861 patent and the Numerical '580 patent by asserting that the '861 structure patent is closely intertwined with fabrication patents because of the axiomatic statement that to "make these things, you need to know what it looks like and . . . have the technology to build it." Ex. A at 274:13–18. She then asserted that the '580 patent "phase shift mask" lithography technology was used "to print the transistor itself." *Id.* at 275:3. But even taken as true, these assertions do not substantiate that the value of the '580 patent to a wafer is comparable to the value of the '861 patent to a wafer. As an initial matter, the '580 patent is a fabrication patent and the '861 patent is a structure patent. That is, the '580 patent does not even cover a portion of a wafer; it covers a lithography technique. In contrast, the '861 patent is limited to a specific transistor configuration (one that includes raised source and drain regions). And Kuhn's attempt to bridge that gap by discussing the intertwining of fabrication and structure patents fails. She testified that the '580 patent was used to print the transistor, but a transistor is much broader than what the '861 patent covers—which is only a specific transistor configuration. She never testified that the '580 patented fabrication method was limited to creating the specific transistor configuration of the '861 patent.

Even if she had, that only relates to the numerator of the above fraction. She never testified regarding what portion of a wafer was dedicated to the '580 patent—nor could she because of the fundamental distinction between the '580 patent covering a method of manufacture and not a component of a wafer. The only proportion Kuhn discussed was that the '580 patent was "a little slice **of the lithography world**." *Id.* at 280:10–24 (emphasis added). Kuhn did not testify regarding what proportion of a wafer was dedicated to '580 patented features. And even for the "lithography world," she did not testify that it was comparable to a wafer or the same value as a wafer. In short, Kuhn did not do the comparison necessary to allow Dell to import the royalty rate

from the Numerical license into the hypothetical negotiation.

As one more layer, even if it were correct to translate the value of the '580 patent to the '861 patent in 2000, Kuhn and Dell failed to analyze or account for the passage of 15 years and significant developments in semiconductor wafers between the 2000 Numerical agreement and the 2015 hypothetical negotiation. It is not enough for the proportion of patented to unpatented features to be the same in 2000, because the hypothetical negotiation would occur in 2015 and be based on the accused product—a 2015 semiconductor wafer. Thus, Kuhn and Dell needed to account for the addition of significant valuable features to the 2015 wafer that were not part of the wafer in 2000. These additional valuable features increase the denominator of the above equation. But Kuhn and Dell did not account for the addition of high-K metal gates in 2007 nor the transition to FinFETs in 2011—many years after the 2000 Numerical agreement. And both were significant developments in semiconductor design. *Id.* at 153:7–155:25, 161:8–162:3, 288:22–289:14, 292:6–15, 294:6–22, 295:14–23, 297:9–15. The issue is not whether high-K-metal gates or FinFETs rendered the '861 patent obsolete (*id.* at 278:9–280:9); the issue is that the addition of valuable features changes the proportion of '861 patented features to the overall wafer. Katana never presented evidence addressing this issue—much less substantial evidence sufficient to support a jury verdict premised on directly applying the Numerical royalty rate from 2000 to the 2015 wafer.

Finally, the "built-in apportionment" doctrine conflicts with the Supreme Court's requirement that a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." Petition for Writ of Certiorari, *R.J. Reynolds Vapor Co. v. Altria Client Servs. LLC*, No. 25-158, 2025 WL 2324744, at *i (Aug. 7, 2025) (citing *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). If the Supreme Court holds that the Federal Circuit's judicially created "built-in

apportionment" doctrine violates the apportionment requirement by allowing unrelated licenses to prove damages without presenting "evidence tending to separate or apportion" the patent's value, this Court should, likewise, grant JMOL based on Katana's reliance on that doctrine.

### 2. Dell's remaining data points do not apportion.

Dell did not—and could not—argue that any other data point provided the required apportionment. First, neither logic nor precedent supports relying on general industry rates to apportion to the value of a specific patent. *See, e.g.*, *Lucent Techs. Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1328 (Fed. Cir. 2009) ("Lucent's brief characterizes the four agreements as covering 'PC-related patents,' as if personal computer kinship imparts enough comparability to support the damages award."). Thus, the industry rates that Mr. Dell discussed from the Ocean Tomo and KPMG reports—for which Dr. Kuhn never even provided any technological comparability analysis—cannot satisfy the apportionment requirement. Similarly, IBM's policy of licensing its portfolio for 1% per patent up to 5% does not apportion to the value of a specific patent—especially because Katana never showed any IBM licensee paid 1% for just one patent. Second, the Federal Circuit has already stated that a patentee's offers do not reliably apportion. *Omega*, 13 F.4th at 1379 (basing apportionment on patentee's "generic licensing arrangement" would improperly permit the patentee to hide behind that policy to avoid the task of apportionment). So the rates that Katana offered in presentations do not reliably apportion for the value of the '861 patent.

### B. Katana and Dell failed to properly apportion the royalty base.

Additionally and independently, Dell failed to rely on an apportioned royalty base. Specifically, Dell relied on the revenue for an entire wafer based on his understanding that the wafer is the smallest salable patent practicing unit. Ex. A at 376:20–378:5. But "simply identifying the smallest salable unit is not necessarily sufficient to satisfy a patentee's obligation to apportion for multi-component products with significant unpatented features." *Power Integrations*, 904 F.3d

at 970; *see also id.* at 977 ("Even when a damages theory relies on the smallest salable unit as the basis for calculating the royalty, the patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features."). It is undisputed that a wafer has myriad valuable features other than the accused infringing feature. As just two examples discussed above, Kuhn acknowledged the importance of high-K metal gates and FinFETs. Thus, despite relying on the entire market value of a semiconductor wafer, Dell never even tried to show that the '861 patented feature drove customer demand for the wafer—which would have permitted him to rely on the entire market value rule ("EMVR") exception. Without satisfying the EMVR, Dell and Katana's reliance on the entire revenue for an infringing wafer was improper and only served to "skew the damages horizon for the jury." *Power Integrations*, 904 F.3d at 977.

The Federal Circuit's analysis in *Power Integrations* is illustrative. In *Power Integrations*, the patentee accused entire power supply controllers of infringing an asserted patent based on the infringing frequency reduction feature. 904 F.3d at 978. The patentee's damages case rested on the entire market value of the infringing power supply controllers. *Id.* at 970, 977. In that case, the patentee at least tried to satisfy the entire market value rule, but the Federal Circuit found that the evidence presented by the patentee failed to meet the demanding standard. *Id.* at 979–80. Specifically, the Federal Circuit noted that the products had other valuable features and the patentee failed to show that those other features did not affect consumer demand. *Id.* at 979–80. The Federal Circuit, thus, granted the accused infringer's JMOL because the patentee's evidence was "insufficient as a matter of law to invoke the entire market value rule." *Id.* at 980.

Here, Katana and Dell did not even try to show that the '861 infringing feature was the sole driver of consumer demand so that Dell could rely on and present the entire market value of the

infringing wafers. And like in *Power Integrations*, Katana and its experts admitted there are other valuable features of a wafer in addition to the infringing feature—including the high-K metal gate and the FinFET. Without establishing that these features do not affect consumer demand, Dell lacked substantial evidence to rely on the entire market value, and the Court should grant JMOL.

Katana compounded the error of relying on GlobalFoundries' multi-billion dollar revenue figure by explicitly arguing damages based—not on the value of the infringing feature—but based on the value of the entire wafer. Specifically, Katana repeatedly emphasized the $1.9 billion revenue figure, including when inviting the jury to select any royalty rate that it desired. *See, e.g.*, Ex. A at 1054:2–10, 32:7, 37:14, 371:25, 433:5, 853:19, 873:14, 874:1, 1007:11, 1053:5–8, 1053:21. The Court should grant JMOL on damages for this additional reason.

### C.    Dell ignored the market evidence tied to the '861 patent.

Dell compounded his error by ignoring the myriad market evidence supporting a properly apportioned damages award for the '861 patent. Specifically, Dell ignored three categories of market evidence: (i) licenses by Sharp—the licensor at the hypothetical negotiation—to the '861 patent; (ii) the sale of all rights to the '861 patent by Sharp three years after the hypothetical negotiation; and (iii) multiple licenses by Katana that included the '861 patent.

First, Dell never even tried to examine the multiple license agreements that Sharp had with semiconductor companies. When Sharp conveyed the '861 patent to Katana, the agreement listed nine semiconductor companies with licenses to the '861 patent. P-27.13; Ex. A at 100:7–24, 442:21–443:25. The companies included Apple, IBM, Intel, and Texas Instruments. P-27.13. Katana does not have those licenses. Ex. A at 105:9–15. Dell never received them—much less reviewed or analyzed them. *Id.* at 444:14–17, 446:6–11. He acknowledged that Sharp and GlobalFoundries would have known the contents of those licenses in the hypothetical negotiation. *Id.* at 446:23–448:10. And he acknowledged they would be relevant to *Georgia-Pacific* factor 1.

███████████████████████████████████████████

*Id.* at 449:15–22. But he never even tried to procure those licenses.

Second, Dell discounted the sale of the '861 patent by Sharp ██████████. *Id.* at 450:13–16. He said that the sale was irrelevant because he did not believe there was evidence that Sharp was aware of GlobalFoundries' extent of use of the '861 patent. *Id.* at 456:7–13. But he admitted that Sharp knew that GlobalFoundries was unlicensed and would have known the general level of wafer sales by semiconductor companies. *Id.* at 456:16–458:15; P-27.14. Nevertheless, Dell opined that even though Sharp was willing to sell the '861 patent ██████████ in 2018, it would have demanded many times that amount to grant GlobalFoundries a license in 2015. And he did so by saying that ██████ data point was irrelevant to his analysis based on a faulty premise.

Third, Dell similarly ignored and discounted the multiple Katana licenses for the '861 patent. For example, Katana executed license agreements ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████ Dell discounted these licenses because he opined that Katana did not have extent of use information. *E.g.*, Ex. A at 459:25–460:3. But, again, he contradicted his own opinion by admitting that public sources of information reveal extent of use estimates for semiconductor companies and that Katana was aware of and relied on that information. *E.g.*, *id.* at 462:2–10.

In sum, Dell reached his conclusion on damages by completely ignoring nine existing licenses by Sharp for the '861 patent, improperly dismissing Sharp's sale of the '861 patent as irrelevant, and, similarly, improperly disregarding other licenses to the '861 patent by Katana. Each of these data points is directly tied to the '861 patent and the hypothetical negotiation. *E.g.*, *Ecofactor, Inc. v. Google LLC*, 137 F.4th 1333, 1340–41 (Fed. Cir. 2025) (en banc) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty

for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace.") (citation omitted). The nine licenses by Sharp to semiconductor companies for the '861 patent act as proxies for the hypothetical negotiation—which is to determine the amount that Sharp and GlobalFoundries (another semiconductor company) would have agreed to for a license to the '861 patent. Similarly, what Sharp was willing to take for a sale of all rights to the '861 patent reflects Sharp's belief of the value of the patent. And Katana's agreements licensing the '861 patent similarly provide direct data points on its value. Dell compounded his apportionment failures by completely ignoring and disregarding this data.

> ### D.    The proper remedy for Katana's failure to apportion is to limit damages to the amount supported by substantial evidence.

Reduction of damages is required—without a new trial—where the plaintiff has produced no evidence in support of a legally viable theory that could allow for damages greater than what the defendant proposed. For example, in *Tronzo v. Biomet, Inc.*, the Federal Circuit upheld reducing damages from $7,134,000 to $520. 236 F.3d 1342, 1344 (Fed. Cir. 2001). It held that the reduction should not be treated as a remittitur or otherwise allow for a new trial on damages. *Id.* at 1351. In that case, "the district court did not reweigh any evidence, nor did it exercise its discretion in computing the damages award[,]" and instead "awarded the maximum damages possible given the lack of competent evidence" for an award greater than $520. *Id.* Although the plaintiff argued for more, the evidence "that Dr. Tronzo attempted to rely on was too remote and inconclusive to reflect the actual injury incurred by Dr. Tronzo or to measure his damages." *Id.*

This case falls squarely within the rationale of *Tronzo*. Katana chose to offer a damages theory that was unsupportable as a matter of law. Even after being granted an opportunity to supplement, Katana made a strategic choice to base damages on a flawed built-in apportionment theory. That failure after multiple chances provides no legal or equitable reason to allow Katana a

third attempt. *See Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) (holding that plaintiff was not necessarily entitled to damages or a new trial where it failed to put on a legitimate damages case). Indeed, allowing retrials in such cases would reward such violations.

Federal Circuit precedent contemplates the Court considering whether a party "waived the right to establish reasonably royalty damages under a new theory and whether to order a new trial on damages." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1312 (Fed. Cir. 2018). In *Finjan*, for one of three patents, the Federal Circuit held that the plaintiff failed to present a damages case supported by substantial evidence. *Id.* at 1311–12. In the face of the plaintiff's "fail[ure] to present a damages case that can support the jury's verdict," the Federal Circuit remanded the case to the district court with instructions "to determine whether [the plaintiff] has waived the right to establish reasonable royalty damages under a new theory and whether to order a new trial on damages." *Id.* That is, the Federal Circuit contemplated that a party that fails to present an adequate damages theory is not entitled to a new trial and, instead, has "waived the right to establish reasonable royalty damages under a new theory." Here, the Court already granted Katana multiple tries to establish a viable theory; it failed twice and should not be granted a third opportunity.

Of course, "the district court must award damages in an amount no less than a reasonable royalty when infringement is found." *Id.* (citation modified). Here, GlobalFoundries' damages theory was the only evidence that considered licenses and sales of the '861 patent. Rather than allow a new damages theory and new trial, the Court should find that Katana waived any alternative theories and award the maximum $1.0 million based on GlobalFoundries' evidence.

## V.    CONCLUSION

Katana's damages should be reduced to $1.0 million based on its failure to apportion.

Dated: September 2, 2025

Respectfully submitted,

By: */s/ Allan M. Soobert*

Allan M. Soobert (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
Telephone: (202) 551-1822
Facsimile: (202) 551-0222
allansoobert@paulhastings.com

Joseph J. Rumpler, II (*pro hac vice*)
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
Telephone: (650) 320-1800
Facsimile: (650) 320-1900
josephrumpler@paulhastings.com

Soyoung Jung (*pro hac vice*)
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, CA 90071
Telephone: (213) 683-6211
Facsimile: (213) 996-3211
soyoungjung@paulhastings.com

Paige A. Amstutz
Texas State Bar No. 00796136
E-mail: pamstutz@scottdoug.com
Lauren Ditty
Texas State Bar No. 24116290
E-mail: lditty@scottdoug.com
SCOTT, DOUGLAS & MCCONNICO, LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399

*Counsel For Defendants Globalfoundries Inc., Globalfoundries U.S. Inc., and Globalfoundries U.S. 2 LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of September, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record. Any documents filed under seal were served by email.

<u>*/s/ Allan M. Soobert*</u>
Allan M. Soobert